UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONA MATTHEWS

      Plaintiff,                              Case No. 19-13277

vs.                                     HON. MARK A. GOLDSMITH

DETROIT PUBLIC SCHOOLS COMMUNITY
DISTRICT, et al.,

      Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT**
**DETROIT PUBLIC SCHOOL COMMUNITY DISTRICT'S MOTION FOR SUMMARY**
**JUDGMENT (Dkt. 32)**

      This matter is before the Court on Defendant Detroit Public Schools Community District's

motion for summary judgment (Dkt. 32). Plaintiff Mona Matthews filed a response (Dkt. 34), and

Defendant filed a reply (Dkt. 39). The motion has been fully briefed. Because oral argument will

not assist in the decisional process, the motion may be decided based on the parties' briefing. See

E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons discussed below, the Court grants

the motion in part and denies it in part.

**I.      BACKGROUND**

      This employment-discrimination action arises under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq., the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich.

Comp. Laws § 37.2101 et seq., and 42 U.S.C. § 1981. It stems from Matthews's time spent

working at the Detroit Public Schools Community District (DPSCD), having been assigned there

in 2015 by Kelly Services, Inc. (KSI). Matthews Dep. at 10 (Dkt. 34-2). KSI and DPSCD were

parties to a contract in which KSI provided staff-augmentation services to DPSCD.  Statement of Material Facts (SOMF) ¶ 2 (Dkt. 32); Counter-SOMF ¶ 2 (Dkt. 34).  KSI placed Matthews in the DPSCD Office of Student Records.  Matthews Dep. At 17.  When Matthews was first placed in the office, she did not have a direct supervisor.  Id.  In or around November 2015, however, DPSCD employee Don Dameron was assigned to supervise the Office of Student Records and thereby became Matthews's supervisor.  Id. at 19.

Matthews alleges that, from approximately November 2015 until May 2017, Dameron subjected her to sexual harassment by creating a hostile work environment. Compl. ¶¶ 76, 105. She recounts a number of incidents in which she claims that Dameron sexually harassed her, including:

- Dameron asked Matthews questions about her sex life.

- He asked her out on dates.

- He asked her if she would meet him at a hotel.

- Dameron repeatedly made degrading jokes about female employees in the department as well as female customers.

- He blew kisses at Matthews, licked his lips while looking at her, and lustfully stared at her.

- He denied Matthews's requests for time off by stating something to the effect of, "No, you cannot have time off because I want you here so I can look at you."

- He offered to help Matthews lose weight by having sex with her.

- He sent a text message to a co-worker, who then showed it to Matthews, in which he asked, "Is Mona's ass getting bigger?"

- He told Matthews, "I want to eat your big ass while you are on your period if you still have those" while sticking out his tongue and rolling it around as if to mimic oral sex.

- He told Matthews that he could tell by the way a woman walked that her "stuff is worn out" and then stated to Matthews, "I can tell by the way you walk you have good stuff."

- He told Matthews and her coworkers that when he first moved to Detroit, he could buy a woman two bags of groceries and "fuck the bitch and her kids would start calling me daddy."

- He told Matthews and her coworkers that when he was in seminary school, he used to have sex with female students on the floor.

- He proclaimed to co-workers in the office that it looked like Matthews was "eating cum" when she was eating potato soup.

- Dameron stated to Matthews and another coworker that a woman would be obligated to have sex with a man if the man took the woman to a specific restaurant on a date. He then asked Matthews if he could take her to that restaurant on a date.

- When Matthews noticed Dameron staring at her in a sexual manner and told him that it made her uncomfortable, he told her that she can always leave if she does not like it.

- He announced to the office that he would "be with Mona" over the weekend, implying a sexual relationship.

- After Matthews returned to work from a vacation, Dameron told Matthews and her co-workers that he was happy "Mona is back" because he did not have anyone to pick on and that he was going to "make her cry this week."

- He told Matthews that he wanted her to have his address so that she can "come over late one night."

- He sent text messages to Matthews in which he stated that one person "want[s]" another person "the way I want you"; called her "Princess"; asked if she was trying to "throw [him] a hint" when she stated that she would never date a coworker; referred to another female employee as a "dirty bitch"; and told Matthews, "it's all up to you," implying that he would engage in a relationship if she were willing.

Compl. ¶¶ 10–60; Matthews Dep. 46, 71, 131–138.

According to Matthews, around April 2017 (she is unable to recall the exact date), she called Sharon Price, her contact at KSI, to ask what steps an employee would take if he or she were experiencing harassment. Matthews Dep. at 140, 145–148. Matthews testified that shortly thereafter, she called Dameron's supervisor, Jon Brent, and told him that she was being sexually harassed by Dameron at work. Id. at 68, 140–142, 145–148. On May 3, 2017, she contacted Price again and, this time, described Dameron's alleged harassment. See 5/4/17 Email (Dkt. 34-7);

Emails Between KSI and DPSCD at 1 (Dkt. 32-8).  The following day, Brooke Juliano, an employee in KSI's human resources department, contacted DPSCD's Director of Human Resources, Lauri Washington, to inform her that an unnamed KSI employee was making a harassment complaint against a DPSCD employee.  5/5/17 Email (Dkt. 34-13); Emails Between KSI and DPSCD at 4.

On May 5, 2017, Matthews stopped reporting for work at DPSCD; she testified that she was afraid to return after she complained of harassment.  Emails Between KSI and DPSCD at 2; Matthews Dep. at 74–75.  On May 9, 2017, she sent an email describing Dameron's alleged harassment to Price, which she titled "Formal complaint of workplace sexual harassment, harassment, skin color, age and retaliation."  Formal Complaint (Dkt. 32-6).

Two days later, on May 11, 2017, Dameron emailed Price, stating "Chante [another employee] is here today.  Please remove Mona from this account.  We will be going in another direction."  5/11/17 Email from Dameron to KSI (Dkt. 34-6).  Price then forwarded the email to Juliano, who proceeded to email Washington and state in reference to Matthews, "Don has indicated he would like to remove her from this assignment, of course we cannot do that pending this complaint."  5/11/17 KSI Email to DPS (Dkt. 34-9).

Based on Matthews's complaint, KSI conducted an investigation by interviewing KSI employees, and Juliano shared with Washington notes from the interviews.[1]  KSI Investigation (Dkt. 34-10); Emails Between KSI and DPSCD at 7, 10.  It also advised Matthews that while her complaint was being investigated, Matthews would continue to be paid, and it would work to find

---

[1] Juliano testified that KSI can interview employees who, like Matthews, were placed at DPSCD by KSI.  Juliano Dep. at 14 (Dkt. 34-3).  But she stated that it cannot interview employees who, like Dameron, were employed directly by DPSCD.  Id.

her another assignment.  Matthews Dep. at 75.  Ultimately, KSI did not find another placement for Matthews, and it ended her pay in June 2017.  Juliano Dep. at 25; Last Pay Reference (Dkt. 32-7).

The parties present different narratives regarding the way in which DPSCD responded to Matthews's complaint.  According to Matthews, DPSCD refused to conduct a follow-up investigation or take remedial action after KSI reported its findings, and it ignored KSI's calls and emails.  Counter-SOMF ¶¶ 27–31.  According to DPSCD, Washington notified Juliano that because Dameron was a union member, Washington needed to notify the union before speaking to Dameron; it states that after providing this notification, the next communication it received about Matthews was Matthews's Equal Employment Opportunity Commission (EEOC) complaint, which it learned of several months later.  SOMF ¶¶ 32–33.  DPSCD responded to the EEOC complaint, requesting that it be dismissed because Dameron denied sexually harassing Matthews.  9/28/17 DPS Response to EEOC at 2–3 (Dkt. 34-15).

After receiving a "right to sue" letter from the EEOC, EEOC Determination (Dkt. 34-5), Matthews brought this action.  In addition to claiming that Dameron subjected her to sexual harassment by creating a hostile work environment, Matthews alleges that he subjected her to quid pro quo sexual harassment by terminating her when she refused to engage in a sexual relationship and complained about his advances.  Compl. ¶¶ 87–101, 115–128.  She further states that he created a racially hostile work environment by making derogatory comments about her race as an African-American individual and her light skin tone.  Id. ¶¶ 129–169.  And she alleges that she was retaliated against for complaining about the harassment.  Id. ¶¶ 170–182.

Matthews asserts the following claims: sexual harassment that creates a hostile or offensive work environment in violation of Title VII and the ELCRA (Counts I and III); quid pro quo sexual harassment in violation of Title VII and the ELCRA (Counts II and IV); racial discrimination and

harassment in violation of Title VII, the ELCRA, and 42 U.S.C. § 1981 (Counts V, VI, and VII); and unlawful retaliation in violation of Title VII and the ELCRA (Count VIII).  Id. ¶¶ 73–182.

## II.  MOTION STANDARDS

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## III.  ANALYSIS

DPSCD seeks summary judgment on several grounds.  First, it contends that the conduct that Matthews complains of was not sufficiently severe or pervasive to create an objectively and actionable hostile work environment.  Mot. at 11–12.  It also argues that even if a sexually hostile work environment existed, there is no basis for employer liability under Title VII or the ELCRA. Id. at 16–21.  Second, DPSCD argues that Matthews cannot prevail on her quid pro quo sexual harassment claim under the ELCRA or Title VII because Matthews's refusal to submit to Dameron's advances did not result in a tangible employment detriment, as she was not fired, but,

rather, she and KSI agreed that she would stop reporting to DPSCD. <u>Id.</u> at 21–23. Further, it states that, under Title VII, it cannot be liable for any actions that Dameron took because Dameron had no actual authority to hire, fire, promote, or discipline. <u>Id.</u> at 24. Third, DPSCD argues that Matthews cannot bring a race discrimination claim under Title VII because she did not check the box for "race discrimination" on her EEOC charge and, additionally, that there is insufficient evidence of race and/or color discrimination to support a claim under Title VII, the ELCRA, and § 1981. <u>Id.</u> at 24–25. Fourth, DPSCD states that it is entitled to summary judgment on the Title VII and the ELCRA retaliation claims because it did not take any materially adverse action against Matthews because of her complaints. It again maintains that she was not terminated but rather decided with KSI to stop reporting to work. <u>Id.</u> at 25. The Court evaluates each of these issues in turn.

### A. Hostile Work Environment Sexual Harassment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile work environment. <u>Meritor Sav. Bank v. Vinson</u>, 477 U.S. 57, 66 (1986). This type of discrimination occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (punctuation modified).

Similarly, the ELCRA provides that "[a]n employer shall not . . . discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of

employment, because of . . . sex . . . ."  Mich. Comp. Laws § 37.2202(1)(a); <u>see also</u> <u>Harrison v. Olde Fin. Corp.</u>, 572 N.W.2d 679, 684 (Mich. Ct. App. 1997) (noting that the ELCRA "was patterned on Title VII").  The statute defines sex discrimination to include sexual harassment.  Mich. Comp. Laws § 37.2103(i).  Sexual harassment, in turn, is defined to include "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" that "has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive . . . environment."  <u>Id.</u> § 37.2103(h)(iii).

To establish a prima facie case of sexual harassment based on a hostile work environment under Title VII and the ELCRA, a plaintiff must show that: (i) she was a member of a protected class; (ii) she was subjected to unwelcome harassment; (iii) the harassment was based on sex; (iv) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (v) there is a basis for employer liability.  <u>Ladd v. Grand Trunk W. R.R., Inc.</u>, 552 F.3d 495, 500 (6th Cir. 2009); <u>see also</u> <u>Wasek v. Arrow Energy Serv., Inc.</u>, 682 F.3d 463, 468 (6th Cir. 2012) (noting that the ELCRA hostile work environment analysis is "identical to" the Title VII analysis, and that "Michigan courts often interpret [the] ELCRA provisions using Title VII case law").

The parties' dispute centers on the fourth and fifth elements: whether Dameron's alleged conduct was severe or pervasive enough to establish an actionable hostile work environment claim and whether there is a basis for employer liability.

## 1.  Severity or Pervasiveness

The United States Supreme Court has indicated that the determination of whether harassing conduct is sufficiently severe or pervasive is not susceptible to a "mathematically precise test."

Harris, 510 U.S. at 22–23. On summary judgment, the Court looks to the totality of the alleged sex-based harassment to determine whether it was "'sufficiently severe or pervasive to alter the conditions of [a plaintiff's] employment and create an abusive working environment.'" Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 512 (6th Cir. 2011) (quoting Harris, 510 U.S. at 21). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

The United States Court of Appeals for the Sixth Circuit has further explained that "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999). Generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (punctuation modified). In contrast, "sexual comments and harassing acts of a continual nature are more likely to be deemed pervasive." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (punctuation modified). In addition, discriminatory conduct does not need to be directed at the plaintiff to contribute to a hostile work environment. Berryman v. SuperValu Holdings, Inc., 669 F.3d 714, 718 (6th Cir. 2012). But whether a plaintiff was the intended target of the discriminatory conduct informs the totality-of-the-circumstances analysis. See Black v. Zaring Homes, Inc., 104 F.3d 822, 823–824 (6th Cir. 1997).

Here, Matthews's complaint and testimony detailed 22 incidents between November 2015 and May 2017 that she alleges constitute sexual harassment. She testified that the alleged

harassment was not sporadic but rather ongoing during the time in which Dameron supervised her. Several of these incidents were explicitly sexual.  For example, she testified that Dameron asked her to meet him at a hotel; told Matthews while miming oral sex, "I want to eat your big ass while you're on your period if you still have those"; offered to help Matthews lose weight by having sex with her; and, while Matthews was eating potato soup, proclaimed that it "looks like Mona is eating cum."   Matthews Dep. at 71, 133–138.  She also testified that Dameron told her that he wanted her to have his address so she could "come over late one night"; told her he could tell by the way a woman walked that her "stuff is worn out" before stating to her, "I can tell by the way you walk you have good stuff"; and told Matthews and another coworker that a woman would be obligated to have sex with a man if the man took the woman to a specific restaurant on a date—and then asked Matthews if he could take her to that restaurant on a date.  Matthews Dep. at 46, 136. Moreover, all but four of the alleged incidents were directed at Matthews.

The Court finds that given the numerosity of the comments made over a year and a half, their continual nature, their explicit sexual nature, and the fact that they were most often targeted at Matthews, the totality of the circumstances indicates that, at a minimum, a genuine issue of material fact exists as to whether the alleged harassment was sufficiently severe or pervasive such that it altered the conditions of Matthews's employment and created a hostile working environment.   Compare Thornton v. Fed. Express Corp., 530 F.3d 451, 456 (6th Cir. 2008) (determining that a genuine issue of material fact existed on severity or pervasiveness where the supervisor's "continuous preoccupation with sex talk and persistent unwelcome advances"— consisting of 20 incidents over two years that were often targeted at plaintiff—"were degrading, offensive, increasingly intimidating and inexcusable"), and Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 252 (6th Cir. 1998) (holding that the plaintiff presented enough evidence to indicate

that sexual comments were sufficiently pervasive and survive summary judgment by testifying that the "sexual comments . . . went beyond business and into the personal" and were "commonplace," "ongoing," and "continuing"), with Clark v. United Parcel Serv., Inc., 400 F.3d 341, 351 (6th Cir. 2005) (finding that three relatively isolated incidents over a period of approximately two and a half years were not pervasive enough to alter the conditions of employment and create an abusive situation), and Burnett v. Tyco Corp., 203 F.3d 980, 984 (6th Cir. 2000) (finding that three alleged incidents of sexual harassment over six months did not create a genuine issue of material fact as to whether the conduct constituted hostile work environment sexual harassment).

DPSCD states that Dameron's alleged conduct was simply "inappropriate for the workplace" and consisted of "some" "sexual comments and jokes" that were "very crude." Mot. at 16. But the Court finds that the alleged conduct Matthews has described cannot be categorized simply as stray comments, "isolated incidents," or "mere offensive utterance[s]." See Faragher, 524 U.S. 775, 787–788 (1988). Instead, facts exist upon which a reasonable jury could determine that, under Title VII and the ELCRA,[2] Matthews experienced an objectively hostile work environment due to sexual harassment.

---

[2] While Michigan courts consider federal case law interpreting Title VII to be persuasive authority on claims brought under the ELCRA, the Michigan Supreme Court has held that "only conduct or communication that is sexual in nature can constitute sexual harassment." Haynie v. State, 664 N.W.2d 129, 135 (Mich. 2003). Here, Matthews has alleged "unwelcome sexual advances, requests for sexual favors, [or] other verbal or physical conduct or communication of a sexual nature." Id. (quoting Mich. Comp. Laws § 37.2103(h)(iii)). Even considering solely the explicitly sexual conduct that Matthews alleges Dameron subjected her to, a genuine question of fact on pervasiveness or severity exists given the conduct's frequency, explicitness, and Matthews's testimony about its humiliating nature. See Harris, 510 U.S. at 21.

### 2. Employer Liability

DPSCD asserts that even if Dameron's alleged conduct unreasonably interfered with Matthews's work performance and created a hostile environment, it is not liable under Title VII or the ELCRA.  Mot. at 16–20.  It states that is not liable under Title VII because Matthews experienced no adverse employment action, as she was never terminated; rather, she and KSI decided that she would not report to work at DPSCD.  Id. at 18.  Therefore, DPSCD maintains, it can assert an affirmative defense that allows it to avoid vicarious liability for any alleged harassment by Dameron because (i) it had a policy that required employees to report sexual harassment and provided instructions on how to report, and (ii) Matthews was unreasonable in failing to take advantage of that policy and timely report.  Id. at 18–21.  It likewise asserts that it is not liable under the ELCRA because it had no actual or constructive notice that Matthews was being harassed until around the time Matthews stopped reporting to work, given that Matthews did not file a complaint until then.  Id. at 16–18.  The Court first discusses liability under Title VII and then turns to liability under the ELCRA.

### a. Title VII

Under Title VII, an employer can be vicariously liable when a supervisor who has immediate or successively higher authority over an employee creates a hostile work environment. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 745 (1998).  If the employee suffered some tangible employment action, then liability is automatic.  Clark, 400 F.3d at 348 n.1.  Tangible employment actions are significant changes in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, or other factors unique to [the employee's] particular situation."  Akers v. Alvey, 338 F.3d 491, 497–498 (6th Cir. 2003).  In contrast, if the employee did not suffer tangible job

consequences as a result of a supervisor's actions, the employer can raise an affirmative defense. Through this affirmative defense, the employer can avoid vicarious liability for a hostile work environment by establishing that (i) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," often by having a policy on sexual harassment that is effective in practice, and (ii) the employee unreasonably failed to use complaint opportunities that were available. Clark, 400 F.3d at 348.

DPSCD states that Matthews experienced no adverse employment action because she was not terminated; rather, Dameron merely sought a replacement for Matthews once Matthews stopped reporting to work. Reply at 2 (Dkt. 39). It acknowledges that Dameron sent an email to Price, Matthews's contact at KSI, that stated "Chante [another employee] is here today. Please remove Mona from this account. We will be going in another direction." 5/11/17 Email from Dameron to KSI. But it states that KSI's response to the email indicates that Dameron did not terminate Matthews—and had no power to do so. Mot. at 22. Specifically, it points to the fact that when Price forwarded the email to Juliano, Juliano then emailed DPSCD's Director of Human Resources, Washington, and stated that "Don would like to remove [Matthews] from the assignment, but of course we cannot do that pending the complaint." Mot. at 22; 5/11/17 KSI Email to DPS.

Matthews offers a different account. She maintains that through his email instructing Price to remove Matthews from the account, Dameron terminated Matthews. Resp. to Mot. at 22 (Dkt. 34). She states that Dameron's termination was an adverse action and, therefore, DPSCD cannot invoke an affirmative defense to liability. Id.

The Court finds that, given these two competing accounts of whether Dameron terminated and could terminate Matthews, each supported by the record, there is a genuine factual question

as to whether Matthews suffered a tangible employment action.  The lack of a tangible employment action is a precursor to invoking the affirmative defense to liability in hostile environment sexual harassment cases.  See Clark, 400 F.3d at 348, 348 n.1 (explaining that "so long as the harassment did not result in a negative tangible employment action for the victim, the employer has an available affirmative defense" to a hostile work environment claim but that "[i]f the victim did suffer some tangible employment action, such as a demotion, discharge, or undesirable transfer, then liability is automatic and the employer does not have the benefit of the affirmative defense").  Because there is a factual issue as to whether Matthews suffered a tangible employment action, the affirmative defense based on Matthews's alleged failure to promptly invoke DPSCD's alleged sexual harassment policy cannot be a basis for summary judgment at this juncture.

### b.  The ELCRA

In addition to asserting that it is not liable for Dameron's alleged conduct under Title VII, DPSCD states that it is not liable under the ELCRA.  "Unlike federal employment discrimination law, where the employer's prompt remedial action is an affirmative defense to a hostile work environment on which the employer has the burden of proof . . . under Michigan law[,] the element of respondeat superior requires a showing by the plaintiff that an employer had notice of the alleged conduct constituting harassment and failed to take corrective action." Kalich v. AT&T Mobility LLC, 748 F. Supp. 2d 712, 722 (E.D. Mich. 2010).  Thus, to hold an employer responsible for hostile work environment sexual harassment under the statute, the plaintiff must show that the employer "failed to take prompt and adequate remedial action upon reasonable notice of the creation of a hostile work environment." Elezovic v. Ford Motor Co., 697 N.W.2d 851, 863 (Mich. 2005) (punctuation modified).  Accordingly, an employer has a duty to investigate and remedy

alleged sexual harassment "only if it has actual or constructive notice of the offensive environment." Downer v. Detroit Receiving Hosp., 477 N.W.2d 146, 148 (Mich. Ct. App. 1991).

To establish actual notice, a plaintiff must show that she reported the harassment to someone in "higher management"—that is, to "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." Sheridan v. Forest Hills Public Sch., 637 N.W.2d 536, 542–543 (Mich. Ct. App. 2001); see also Neview v. D.O.C. Optics Corp., 382 F. App'x 451, 456 (6th Cir. 2010) (finding that an employer did not have actual notice when the plaintiff warned a coworker about that coworker's conduct but did not tell her supervisor about it). Actual notice is measured from the date when the plaintiff reports the alleged conduct to someone in higher management. See Kalich v. AT&T Mobility LLC, 679 F.3d 464, 474 (6th Cir. 2012).

Alternatively, the plaintiff can establish constructive notice by showing that under the totality of the circumstances and viewing the circumstances objectively, a reasonable employer would have known there was a substantial probability that an employee was being sexually harassed. Sheridan, 637 N.W.2d at 542 (finding that an employer did not have constructive notice when the plaintiff was harassed on four occasions over a three-year period, made only generalized complaints, and told a manager who inquired about what was bothering her that it was "none of their business").

In its motion for summary judgment, DPSCD contends that it did not have actual or constructive notice of any alleged harassment until around the time Matthews had already stopped reporting at DPSCD because Matthews did not complain about Dameron before then, and neither did any other employee. Mot. at 1–2. It also states that when KSI contacted DPSCD to inform DPSCD of Matthews's complaint, KSI initially kept Matthews's name confidential. Id. at 18.

DPSCD acknowledges that Matthews testified that she reported the harassment to Dameron's supervisor, Brent, but it claims that she should have instead informed KSI about her desire to keep her job or be reassigned.  Id.

　　As part of establishing a prima facie case of hostile work environment sexual harassment, Matthews bears the burden of proving that DPSCD failed to take prompt and adequate remedial action upon receiving notice of Dameron's alleged harassment.  See Elezovic, 697 N.W.2d at 863. The Court finds that she has not met this burden.  In her response to DPSCD's motion for summary judgment, Matthews maintains that DPSCD received actual notice of the alleged harassment when she called Brent and when KSI contacted Washington to inform Washington of the complaint. Resp. to Mot. at 21.  However, Matthews does not raise any argument rebutting DPSCD's contention that, because of the short window between when Matthews reported and when her time at DPSCD ended, DPSCD did not have sufficient notice to establish liability.  Matthews's argument regarding employer liability focuses solely on the affirmative defense that an employer can raise under Title VII—not the issue that DPSCD lacked notice under the ELCRA given the timing of Matthews's reporting.  See Resp. to Mot. at 20–22.  Matthews thereby conceded this issue.

　　In any case, because of the one- or two-day timespan between when Matthews complained of the alleged harassment and when Matthews stopped reporting at the workplace, Matthews did not give DPSCD sufficient time to launch a remedial response.  Cf. Jones v. USA Petroleum Corp., 20 F. Supp. 2d 1379, 1384 (S.D. Ga. 1998) (stating in the context of Title VII constructive discharge claims that "the . . . keystone to a sexual harassment claim is notice.  The notice must be sufficient to afford an employer with a reasonable opportunity to remedy the problem."); Chambers v. Trettco, Inc., 614 N.W.2d 910, 919 (Mich. 2000) (stating that under the ELCRA, "the

relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff") (punctuation modified). Matthews estimated that she spoke to Brent "no more than two days" before her last day at DPSCD. Matthews Dep. at 142.   The record also indicates that KSI contacted Washington to inform them that a KSI employee was making a sexual harassment complaint against a DPSCD employee one day before Matthews's last day at DPSCD.   5/5/17 Email; Emails Between KSI and DPSCD at 2, 4.   Therefore, the earliest point at which DPSCD received notice of the harassment was one to two days before Matthews's last day.

Because Matthews has shown that a material issue of fact exists regarding the severity or pervasiveness of the alleged harassment and regarding whether she experienced a tangible job detriment, the Court finds that DPSCD is not entitled to summary judgment with respect to the Title VII hostile work environment claim.   However, because Matthews has not demonstrated a genuine issue that she provided notice to DPSCD in a manner sufficient to satisfy the employer liability element of her claim under the ELCRA, the Court finds that DPSCD is entitled to summary judgment with respect to the hostile work environment claim under the ELCRA.

**B.  Quid Pro Quo Sexual Harassment**

Next, DPSCD argues that Matthews cannot establish the elements of a quid pro quo sexual harassment under Title VII or the ELCRA.   The Court begins with the Title VII claim and then turns to the ELCRA claim.

**1.  Title VII**

To make out a prima facie case of quid pro quo sexual harassment under Title VII, a plaintiff must prove that (i) she was a member of a protected class; (ii) she "was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors"; (iii)

17

the harassment she complained of was based on sex; (iv) her "submission to the unwelcomed advances was an express or implied condition for receiving job benefits," or her "refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment"; and (v) liability may be imputed to the employer. Highlander v. K.F.C. Nat'l Mgmt. Co., 805 F.2d 644, 648 (6th Cir. 1986).

DPSCD argues that it is entitled to summary judgment on Matthews's Title VII quid pro quo claim because she can satisfy neither the fourth nor the fifth element. The Court begins by discussing the issue of submission to or rejection of unwelcome advances and then turns to the employer liability element.

Regarding the fourth element of establishing a prima facie case of quid pro quo sexual harassment, DPSCD argues that Matthews cannot show that her submission to unwelcome advances was an express or implied condition for receiving job benefits or that her refusal to submit to Dameron's alleged sexual demands resulted in a tangible job detriment. Mot. at 22–23. DPSCD states that, to the contrary, Dameron helped secure KSI employees, including Matthews, a raise. Id. at 23. And it claims that, though Matthews testified that Dameron often threatened to replace KSI employees, he did not act on those alleged threats. Id. In response, Matthews contends that when she refused to submit to Dameron's unwelcome sexual advances, he terminated her, thereby causing her to experience a tangible job detriment. Resp. to Mot. at 20–21.

To satisfy the fourth element, Matthews must establish (i) a tangible employment outcome, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and (ii) that this outcome occurred because of her refusal to submit to Dameron's alleged unwelcome advances. Ellerth, 524 U.S. at 761; Sanford v. Main St. Baptist Church Manor, Inc., 327 Fed. App'x. 587, 597 (6th Cir.

2009).  As noted above, a genuine question exists as to whether Dameron could and did terminate Matthews because of her sexual harassment complaint.  Under Matthews's account, Dameron terminated her when he emailed Price, stating "Chante [another employee] is here today.  Please remove Mona from this account.  We will be going in another direction."  5/11/17 Email from Dameron to KSI.  Under DPSCD's account, KSI revealed that Dameron had no power to terminate Matthews when Juliano emailed Washington and stated that "Don has indicated he would like to remove her from this assignment, of course we cannot do that pending this complaint."  5/11/17 KSI Email to DPS.  Thus, where DPSCD claims that Dameron's threats went unfulfilled, Matthews suggests that he ultimately followed through.  Moreover, DPSCD attempts to rebut the argument that Matthews did not suffer a tangible job detriment by pointing to the raise that Dameron secured for Matthews and her co-workers.  But it fails to acknowledge that the fact that an employee may have received a job benefit, such as a raise, does not preclude the employee from also potentially later suffering a tangible job detriment, such as termination.  Therefore, the Court finds that a factual question exists with regard to whether Matthews experienced a tangible employment detriment because of her refusal to submit to Dameron's alleged unwelcome advances.

Regarding the fifth element of a prima facie case, "to prevail on a quid pro quo claim, a plaintiff must demonstrate the existence of respondeat superior liability."  Howington v. Quality Rest. Concepts, LLC, 298 Fed. App'x 436, 441 (6th Cir. 2008).  "Under the theory of respondeat superior, employers are held strictly liable for conduct of supervisory personnel who have plenary authority to hire, fire, promote, and discipline employees."  Kauffman v. Allied Signal, Inc., 970 F.2d 178, 186 (6th Cir. 1992).  A supervisor does not need to exercise complete control of plenary duties to qualify as an agent of the employer and thereby trigger respondeat superior liability.  Howington, 298 F. App'x at 441.  Instead, "all that is required is that the employee have

'significant control' of those duties." Kauffman, 970 F.2d at 186.  DPSCD contends that there is no basis for employer liability, given that Dameron did not have actual authority to hire, fire, promote, or discipline.  Mot. at 23–24.  Much like with the hostile work environment sexual harassment claim, it points to Juliano's email to Washington, which stated that "Don has indicated he would like to remove her from this assignment, of course we cannot do that pending this complaint" as proof.  Id. at 22.  It also cites in support of its argument the fact that the KSI employee handbook states that KSI, not the customer with whom it contracts, is the employer of those hired by KSI.  Id.  Matthews counters that Dameron had a supervisory role over her, and that when a supervisor subjects a subordinate to a tangible employment action—like Dameron did by terminating Matthews—the employer is vicariously liable.  As discussed above, a factual dispute exists over the extent of Dameron's authority to terminate Matthews from the DPSCD account.

Because questions of fact exist for the fourth and fifth prima facie elements, the Court finds that DPSCD is not entitled to summary judgment on Matthews's Title VII quid pro quo claim.

## 2.  The ELCRA

Like Title VII, the ELCRA affords employees protection from quid pro quo sexual harassment. Under the statute, such sexual harassment occurs when submission to "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" is "made a term or condition either explicitly or implicitly to obtain employment," or when submission to or rejection of such conduct "is used as a factor in decisions affecting [an] individual's employment."  Mich. Comp. Laws § 37.2103(h)(i)–(ii).  A plaintiff pursuing a quid pro quo sexual harassment claim under the ELCRA must demonstrate that (i) she was "subject to any of the types of unwelcome sexual conduct or communication described in the statute," and (ii) her "employer or the employer's agent used her submission to or

rejection of the proscribed conduct as a factor in a decision affecting her employment." <u>Chambers</u>, 614 N.W.2d at 915.  The second element requires proof of a "tangible (adverse or otherwise) employment action that was shown to be causally related to plaintiff's submission to or rejection of" the alleged sexual harassment." <u>Id</u>.  That is, Matthews must tie her termination to her rejection of Dameron's advances. <u>See</u> <u>Hartleip v. McNeilab, Inc.</u>, 83 F.3d 767, 775 (6th Cir. 1996).

DPSCD contends that Matthews cannot prevail on her quid pro quo claim under ELCRA because no adverse action was taken against her.  Mot. at 22.  It again points to Juliano's email to Washington stating that Matthews could not be removed "pending the complaint" as evidence that Dameron could not take any adverse action against Matthews and that KSI, not DPSCD, was responsible for employment actions related to Matthews.  <u>Id</u>.  It further argues that Matthews has not demonstrated that Dameron was aware of Matthews's complaint.  <u>Id</u>.  Matthews offers the same response as the one she offers for the Title VII quid pro quo claim: she suffered an adverse action because Dameron terminated her.  <u>Id.</u> at 21.

For the same reasons as discussed above, a factual question of Dameron's power to terminate exists.  Moreover, it is unclear from the present facts when exactly Dameron learned of Matthews's complaint.  The record indicates that KSI contacted Washington about a sexual harassment complaint five days before Dameron emailed Price and that Matthews initially requested that her complaint be kept confidential.  5/5/17 Email.  However, it also shows that, as part of its investigation, KSI conducted its first interview of Matthews's coworkers before Dameron requested that Matthews be removed from the account—and that at least some of its interviews took place at DPSCD.  KSI Investigation at 1.

Given the evidence regarding these circumstances, the Court finds that there are enough disputed issues of fact with respect to whether Dameron enjoyed sufficient supervisory authority

21

over Matthews to terminate her because of her complaint, thus precluding summary judgment on Matthews's quid pro quo claim under the ELCRA.

## C.  Racial Discrimination Under Title VII, the ELCRA, and § 1981

Matthews alleges that in addition to experiencing sex discrimination, she was subjected to racial discrimination in violation of Title VII, the ELCRA, and 42 U.S.C. § 1981 when Dameron created a racially hostile work environment by regularly making comments about her race as an African-American individual and her light skin tone.  Resp. to Mot. at v, 22–24.  In its motion for summary judgment, DPSCD contends that Matthews cannot bring an action for race discrimination under Title VII because she did not file an EEOC claim for race discrimination and because she has failed to present sufficient evidence of racial discrimination and harassment in violation of Title VII, the ELCRA, or § 1981.  Mot. at 24–25.  DPSCD recognizes that Matthews is a member of a protected group because of her race but contends that she cannot show that she was treated differently because of her race or color, that Dameron's comments were so pervasive as to create a hostile work environment, or that Matthews was subjected to an adverse action.  Id.

Because jurisdiction is a threshold matter, the Court first addresses the assertion that Matthews cannot bring a race discrimination claim under Title VII because she did not include the claim in her EEOC charge.[3]  Title VII requires a plaintiff to timely file a charge of discrimination with the EEOC as a prerequisite to seeking judicial review.  Puckett v. Tenn. Eastman Co., 889 F.2d 1481, 1486 (6th Cir. 1989).  However, this exhaustion requirement "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural

---

[3] This issue is unique to the Title VII race discrimination claim. "Although generally patterned after Title VII, the Elliott–Larsen Act does not require a claimant to exhaust administrative remedies as a prerequisite to suit."  Cole v. Knoll, Inc., 984 F. Supp. 1117, 1132 (W.D. Mich. 1997).

technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" Randolph v. Ohio Dep't of Youth Serv., 453 F.3d 724, 732 (6th Cir. 2006) (quoting EEOC v. McCall Printing Co., 633 F.2d 1232, 1235 (6th Cir. 1980)). An EEOC complaint should be "liberally construed" to encompass all claims that are reasonably expected to grow out of the discrimination charge. Id.; see also Bray v. Palm Beach Co., No. 89–6171, 1990 WL 92672, at *2 (6th Cir. June 29, 1990) (finding "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge.").

Here, Matthews checked the boxes for discrimination based on "color" and "sex" on her EEOC charge. EEOC Charge (Dkt. 32-9). In the body of the charge, she stated that she is a "light-skinned African American," that Dameron harassed her "about [her] skin tone," and that she was being harassed "based on [her] light-skin color." Id. Construing the EEOC charge liberally, the Court finds that Matthews has raised the claim that she was discriminated against on the basis of race and color, even if she did not state so in explicit terms. Matthews's statement that she is a "light-skinned African American" who was being harassed based on her skin tone implicates both her race and her skin color. Indeed, race and color are entwined because any alleged harassment due to Matthews's identity as a light-skinned African-American individual derives meaning because it invokes both characteristics simultaneously. Further, "most EEOC complaints are completed by laypersons rather than lawyers," and "[t]o compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which [she] may have suffered may cause the very persons Title VII was designed to protect to lose that protection . . . ." Taylor v. W. and S. Life Ins. Co., 966 F.2d 1188, 1195 (7th Cir. 1992) (punctuation modified). Moreover, in her complaint, Matthews stated that the alleged harassment

negatively affected her because, in making a derogatory comment about her light skin tone, Dameron was also calling attention to and disparagingly referencing her race.  Compl. ¶ 23.

Because the Court will not dismiss Matthews's claim for failure to exhaust, it moves on to the substance of the race discrimination claim.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the ELCRA prohibits employers from "[f]ail[ing] or refus[ing] to hire or recruit, discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race."  Mich. Comp. Laws § 37.2202(a).  And § 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors.  Amini v. Oberlin Coll., 440 F.3d 350, 358 (6th Cir. 2006).

To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (i) she belongs to a protected class; (ii) she was subject to unwelcome harassment; (iii) the harassment was based on race; (iv) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (v) the defendant knew or should have known about the harassment and failed to act.  Phillips v. UAW Int'l, 854 F.3d 323, 327 (6th Cir. 2017) (analyzing claims brought under Title VII and the ELCRA in conjunction); see also Noble v. Brinker Intern., Inc., 391 F.3d 715, 720 (6th Cir. 2004) (stating that the elements of a prima facie case and the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981).

"Because the same principles that govern sexual harassment also govern claims of racial harassment," the Court looks at the totality of the circumstances in determining whether the

conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a hostile work environment. Jackson v. Quanex Corp., 191 F.3d 647, 657 (6th Cir. 1999). Accordingly, the relevant considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Harris, 510 U.S. at 22–23.

In her complaint and testimony, Matthews describes several incidents of alleged race-based harassment, including:

- Dameron would "constantly draw attention to [her] lighter complexion and mock her for it" by, on a weekly basis, referring to Matthews as white, stating that Matthews thinks like a white person, and telling Matthews that she feels entitled because she is white.

- Dameron referred to a female worker as "ugly, black and nappy headed."

- After finding out that Matthews had family in Ghana, Dameron sent Matthews an email that stated "a date for you from Ghana" with an image of a gorilla attached.

Matthews Dep. at 30, 96–97; Resp. to Mot. at 23.

The Court finds that, contrary to DPSCD's position, Matthews has shown that she was subject to harassment based on her race because the comments that she described were race-specific and disparaging. See Williams, 643 F.3d at 511 (6th Cir. 2011) (explaining that a plaintiff can prove that harassment was based on race by pointing either to the use of racially derogatory terms or to comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace).

The Court also finds that, considering the totality of the circumstances, a factual question exists as to whether the alleged conduct was sufficiently severe or pervasive such that it created a racially hostile work environment. Matthews estimated that Dameron commented on her skin tone once per week over approximately one and a half years. Such frequent conduct cannot be

described as solely offhand remarks or isolated incidents.  See Kelly v. Senior Centers, Inc., 169 F. App'x 423, 429 (6th Cir. 2006) (distinguishing between a single offensive utterance, which is insufficient to create a jury question on a racially hostile work environment claim, and comments that are a "weekly event"); Torres v. Cnty. Of Oakland, 758 F.2d 147, 152 (6th Cir. 1985) (noting that the continuing use of racially offensive language violates Title VII but that occasional or sporadic uses do not); Williams, 643 F.3d at 513 (finding that racially offensive statements were not pervasive when all but two occurred over a two-day period); Long v. Ford Motor Co., 193 F. App'x 497, 502 (6th Cir. 2006) (holding that racially offensive remarks made by two individuals in two discrete incidents were not pervasive enough to amount to discriminatory changes in the terms and conditions of employment).

Though the comments Matthews described were not physically threatening, they are nonetheless actionable: they were continual; they were almost exclusively directed at her; and  they had nothing to do with the workplace, but rather focused explicitly and entirely on her race and skin tone.  A reasonable jury could find the environment that Matthews experienced objectively offensive and hostile.  Therefore, the Court finds that DPSCD is not entitled to summary judgment on the racial discrimination claims brought under Title VII, the ELCRA, and § 1981.

### D.  Retaliation

Title VII prohibits an employer from retaliating against an employee for participating in an investigation or proceeding under the statute or for opposing the employer's discriminatory practices.  42 U.S.C. § 2000e-3(a).  Similarly, the ELCRA prohibits retaliation or discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."  Mich. Comp. Laws § 37.2701(a).

26

To establish a prima facie case of retaliation under Title VII and the ELCRA, the plaintiff bears the initial burden of establishing that "(1) [s]he ... engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." Khalaf v. Ford Motor Co., 973 F.3d 469, 488–489 (6th Cir. 2020); see also Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004) (stating that claims under Title VII and ELCRA are analyzed under the same evidentiary framework). An adverse employment action requires a "significant change" in employment status rather than a "mere inconvenience." Kocsis v. Multi–Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996).

A plaintiff's "burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." DiCarlo v. Potter, 358 F.3d 408, 420 (6th Cir. 2004). Specifically, the burden of showing that the adverse employment action was causally connected to the protected activity is "minimal" and requires the plaintiff to put forth some evidence from which the Court could draw a reasonable inference that the employer would not have taken the adverse action had the plaintiff not engaged in the protected activity. EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).

The dispute here mirrors the one present in the hostile work environment sexual harassment claims and the quid pro quo claims. Termination is an adverse employment action, see Ellerth, 524 U.S. at 761, but, according to DPSCD, Matthews was never fired as a result of her complaints. Mot. at 25. It claims that Matthews was not terminated but, rather, she and KSI decided that she should stop reporting to work at DPSCD. Id. Matthews counters that she was fired and that

27

Dameron's termination of her days after she complained of sexual harassment and racial discrimination are the paradigmatic example of retaliation.  Resp. to Mot. at 25.

Due to the conflicting evidence as to whether Dameron could or did terminate Matthews, discussed at length above, together with the two-day gap between Matthews's "formal complaint" and Dameron's email instructing Price to remove her from the account, the Court finds that a genuine question exists as to whether Matthews was terminated and whether she was terminated because she complained of harassment.  See Howington, 298 Fed. App'x at 446 (inferring a causal connection between an employer's adverse action and the employee's participation in protected activity, even without other evidence of retaliation, when the employee was suspended two days after her employer received notice that she filed a sexual harassment complaint).  Therefore, DPSCD is not entitled to summary judgment on Matthews's retaliation claims under Title VII and the ELCRA.

## IV.    CONCLUSION

For the reasons stated above, the Court grants DPSCD's motion for summary judgment (Dkt. 32) with respect to the hostile work environment sexual harassment claim under the ELCRA. The Court denies DPSCD's motion for summary judgment with respect to the hostile work environment sexual harassment claim under Title VII; the quid pro quo sexual harassment claims under Title VII and the ELCRA; the race discrimination claims under Title VII, the ELCRA, and § 1981; and the retaliation claims under Title VII and the ELCRA.

SO ORDERED.

Dated: September 27, 2021               s/Mark A. Goldsmith
Detroit, Michigan                      MARK A. GOLDSMITH
                                       United States District Judge

28

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 27, 2021.

s/Jennifer McCoy
Case Manager